UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **RAMON GAMBLE,**<br><br>        Plaintiff,<br><br>v.<br><br>**LEUKO LABS, INC.**<br><br>        Defendant. | Case No.<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT FOR BREACH OF EXPRESS CONTRACT, BREACH OF IMPLIED-IN-FACT CONTRACT, UNJUST ENRICHMENT, QUANTUM MERUIT, AND PROMISSORY ESTOPPEL**

Plaintiff Ramon Gamble, by and through his attorneys, Perkins Coie LLP, states and alleges as follows:

**PRELIMINARY STATEMENT**

1. Leuko Labs, Inc. ("Leuko Labs" or the "Company") is a medical technology company founded by former graduate students and postdoctoral researchers at the Massachusetts Institute of Technology ("MIT").

2. While at MIT, the founders of Leuko Labs collaborated to develop and commercialize an in-home white cell monitor. In January 2016, as the Company prepared to raise seed funding and begin commercializing their graduate school research, they recruited Ramon Gamble, a student enrolled in MIT's Master of Business Administration ("MBA") program, to join the Company to add critical business and fundraising expertise.

3. Leuko Labs subsequently executed a Founders Agreement establishing the Company's proportional ownership of the company. The Founders Agreement named Mr. Gamble

its Chief Financial Officer with 6% ownership of Leuko Labs. A true and correct copy of the Founders Agreement is attached hereto as **Exhibit A**.

4. Mr. Gamble worked for Leuko Labs for over a year without receiving a salary or other compensation.

5. Despite promising Mr. Gamble ownership in Leuko Labs, the Company has unfairly cut Mr. Gamble out of his promised equity shares.

6. Despite numerous demands, Leuko Labs has failed to convey the shares and compensation owed to Mr. Gamble. Plaintiff brings this action to collect these unpaid amounts.

7. Upon information and belief, Leuko Labs is in the process, or already has, raised capital from outside investors that values Leuko Labs in excess of several million dollars. In the event that Leuko Labs has entered into any agreements that would dilute Mr. Gamble's 6% ownership interest, the Court should declare those agreements null and void.

8. Upon information and belief, Mr. Gamble's 6% ownership interest in Leuko Labs is worth more than $75,000.

**PARTIES**

9. Plaintiff Ramon Gamble is an individual permanently residing in Miami, Florida.

10. On information and belief, Defendant Leuko Labs is a corporation organized under the laws of the State of Delaware with its principal place of business in Boston, Massachusetts.

**JURISDICTION AND VENUE**

11. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 since the dispute arises between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

12. Venue is proper in this district under 28 U.S.C. §§ 1391 because a substantial part of the events or omissions giving rise to the claims in this case occurred in this district.

**FACTUAL ALLEGATIONS**

    A.    **Leuko Labs Recruits Ramon Gamble to Help the Company Secure Critical Early Funding and Provide Business Expertise**

13. Leuko Labs is a company founded by former MIT graduate students and researchers. The Company was created "for the purpose of commercializing a non-invasive white blood cell counter." Exhibit A at 1.

14. MIT is a research university located in Cambridge, Massachusetts.

15. Among the founders of Leuko Labs are former postdoctoral researchers at MIT, including Carlos Castro-Gonzalez, Ian Butterworth, Alvaro Sanchez-Ferro, and Aurelien Bourquard.

16. In or around 2015, Mr. Castro-Gonzalez, a fellow in the healthcare innovation partnership program known as MIT linQ (formerly known as M+Vision), partook in a Translational Fellows program through which he connected with MIT's entrepreneurial ecosystem.

17. Soon thereafter, Mr. Castro-Gonzalez met Mr. Gamble, an MIT student pursuing an MBA degree.

18. In or around January 2016, in need of business and financing experience, Mr. Castro-Gonzalez and the fledgling Company recruited Mr. Gamble to join Leuko Labs as a co-founder.

19. Mr. Gamble was recruited to join Leuko Labs because of his prior startup experience as well as his experience in the blood diagnostics space through his employment with Johnson & Johnson and Ortho Clinical Diagnostics.

20. Prior to recruiting Mr. Gamble, the Company had not developed a plan to commercialize its baseline technology.

21. Leuko Labs' other founders, unlike Mr. Gamble, had no experience bringing a product to market.

22. Mr. Castro-Gonzalez and the other founders of Leuko Labs specifically recruited Mr. Gamble to build an initial business strategy, identify financing opportunities, and lead fundraising efforts.

23. Mr. Gamble worked full time for Leuko Labs from January 2016 through February 2017.

24. In addition to building the Company's first business plans, Mr. Gamble performed many other duties for Leuko Labs. For example, Mr. Gamble engaged with strategic partners to develop the Company's initial commercial strategies, prepared market research, created financial models, toured hospitals to understand and develop prototypes, and provided supply chain research.

25. Throughout his tenure with Leuko Labs, Mr. Gamble led the Company' efforts to secure critical non-dilutive funding that financed the development of the Company's first prototypes and positioned the Company for subsequent rounds of financing.

26. On or around April 16, 2016, Mr. Gamble and Leuko Labs participated in the Rice University Business Plan Competition where the Company was awarded $25,000.

27. In or around April 2016, Mr. Gamble led a pitch to apply and obtain funding from the MIT $100k Entrepreneurship Competition.

28. In or around August 2016, Mr. Gamble and the Company applied for a grant from the Deshpande Center for Technological Innovation. Mr. Gamble was listed on the grant as "key personnel."

29. On or around August 12, 2016, the Company received a grant from the Deshpande Center for Technological Innovation of at least $125,000 with the promise of additional financial awards if the Company achieved certain milestones.

30. In 2016, Mr. Gamble and the Company applied to participate in MIT's "delta v accelerator," a program designed to support MIT student entrepreneurs and help them accelerate their progress to build a sustainable business venture.

31. In or around November 2016, Mr. Gamble and the Company applied for and obtained approximately $10,000 in seed funding from the MIT Sandbox Innovation Fund.

32. Without Mr. Gamble's contributions to the Company, it is doubtful that Leuko Labs would have been able to secure the initial funding necessary to commercialize its technology.

    **B.    The Company's Founders Execute a Founders Agreement Providing Ramon Gamble with 6% Initial Ownership in Leuko Labs**

33. On July 19, 2016, Mr. Castro-Gonzalez wrote an email to Mr. Gamble and others involved in the Company's early development and proposed formalizing the company's organization in a Founders Agreement. Mr. Castro-Gonzalez explained that "we've been figuring out how the transition from academic project to commercial venture would work. We need to write a founders agreement." A true and correct copy of the July 2016 correspondence with Mr. Castro-Gonzalez is attached hereto as **Exhibit B**.

34. Mr. Castro-Gonzalez continued in his July 19 email: "You're on this email because I believe you deserve equity in the Leuko company." *Id.*

35. On July 24, 2016, Mr. Castro-Gonzalez emailed the same group of people (including Mr. Gamble) and proposed an equity split in the Company, with Mr. Gamble receiving 6% ownership in the proposal. *See* Exhibit B at 3-4. Mr. Castro-Gonzalez explained that the amount of equity for each Founder was weighed by their "substantial contributions" to the Company's early development, including "funding." *Id.*

36. Mr. Castro-Gonzalez also proposed that Mr. Gamble would be the Company's first Chief Financial Officer ("CFO"). *Id.*

37. The founders met by Zoom videoconference on July 25, 2016 to discuss Mr. Castro-Gonzalez's proposals.

38. After the July 25 meeting, Mr. Castro-Gonzalez emailed the group a revised Founders Agreement incorporating his and the other founders' proposals. The Founders Agreement lists nine individuals entitled to ownership of the Company (the "Founders"). *See* Exhibit A at 2.

39. The Founders Agreement provides that Mr. Gamble is a "Founder" and would receive 6% equity in Leuko Labs. *Id*.

40. The Founders Agreement further provides that, for "non-technical Founders, 25% of each Founder's share will vest after twelve months of full time work (40 hours a week)." *Id*. at 3.

41. All nine Founders agreed to and accepted the terms of the Founders Agreement that Mr. Castro-Gonzalez drafted.

42. For example, on July 26, 2016, Alvaro Sanchez-Ferro, on information and belief the current Chief Medical Officer of Leuko Labs, accepted the terms of the Founders Agreement and responded by email: "Looks good to me." Exhibit B. at 2.

43. Aurelien Bourguard, on information and belief the current Chief Data Scientist of Leuko Labs, accepted the terms of the Founders Agreement and responded by email: "I agree with the document, so, perfectly fine for me too!" *Id*. at 1.

44. On July 27, 2016, Ian Butterworth, on information and belief the current Chief Technical Officer of Leuko Labs, accepted the terms of the Founders Agreement and responded by email: "I'm happy with the document!" and exclaimed, "FOUNDED!" *Id*.

45. On information and belief, Messrs. Castro-Gonzalez, Butterworth, Bourquard, and Sanchez-Ferro make up the entirety of Leuko Labs' present Executive Team.[1]

46. The Founders Agreement provided that "as soon as reasonably practicable" the Company would "register its fictitious name in the jurisdiction where it conducts its business." Exhibit A at 1.

47. After the Founders Agreement was executed, the Company and the Founders functioned according to the Agreement's stated purpose of commercializing a non-invasive white blood cell counter.

48. As Leuko Labs' initial CFO, Mr. Gamble actively participated in these critical early stages of Leuko Labs' development. For instance, as described in the preceding paragraphs, Mr. Gamble led efforts to secure critical initial funding, developed the Company's original business plans and strategy, and provided other operational expertise.

49. Mr. Gamble did not receive a salary or other cash compensation from Leuko Labs as part of his work for Leuko Labs. Rather, the Founders and Mr. Gamble understood that he would be compensated with the equity promised to him under the Founders Agreement.

50. Mr. Gamble worked full time for Leuko Labs for over 12 months, from January 2016 through February 2017.

51. Mr. Gamble turned down offers to join other companies in order to focus on his work with Leuko Labs.

52. Leuko Labs has benefited enormously from Mr. Gamble's contributions to the Company, as Mr. Gamble was recruited to join the Company to raise capital, build initial business strategy, and recruit early-stage strategic partners.

---

[1] *See* https://leuko.com/about.

53. Leuko Labs also benefited from not paying Mr. Gamble a salary during his tenure with the Company.

54. On information and belief, after Mr. Gamble left the Company, pursuant to the Founders Agreement, Leuko Labs caused itself to be registered as a Delaware corporation with its headquarters in Boston, Massachusetts.

    **C.    Despite Vesting Shares Pursuant to the Founders Agreement, Leuko Labs Cuts Ramon Gamble Out of his Promised Equity**

55. On or around March 15, 2021, Mr. Gamble and Mr. Castro-Gonzalez held a telephone conversation to discuss Leuko Labs's progress since Mr. Gamble left the Company.

56. During this conversation, Mr. Gamble expressed that he was happy that Leuko Labs appeared to be doing well since his departure and said that he hoped the Company would continue to achieve success, particularly in light of his vested equity interest in the Company.

57. Mr. Castro-Gonzalez responded and stated that Mr. Gamble did not have *any* equity in Leuko Labs, notwithstanding the Founders Agreement that he had personally drafted and agreed to in July 2016, and notwithstanding that Mr. Gamble had worked full time for the Company without receiving a salary or any other compensation.

58. After the March 15 telephone conversation, Mr. Castro-Gonzalez offered Mr. Gamble approximately 5,000 stock options at an exercise price of $0.10 per share in lieu of his Founder's shares.

59. Mr. Castro-Gonzalez explained in an email to Mr. Gamble on March 26, 2021 that 5,000 stock options were similar "to that of other MBAs who also contributed very significantly and did a similar scope and amount of work in the past, some of which happened after the company was incorporated." A true and correct copy of correspondence between Mr. Gamble and Mr. Castro-Gonzalez in March 2021 is attached hereto as **Exhibit C**.

60. Mr. Gamble was not just an MBA that "contributed very significantly" to Leuko Labs: he was the Company's initial CFO and was promised equity commensurate with his early contributions.

61. Leuko Labs' position that Mr Gamble is not a founder of the Company is belied by the origin story it promotes on its website, which states: "Leuko is a company that spun out from the Massachusetts Institute of Technology". *See* attached as **Exhibit D** a true and correct excerpt of Leuko's webpage as of February 9, 2022.

62. Mr. Gamble's efforts to resolve this dispute have failed. On or around September 13, 2021, counsel for Mr. Gamble sent the Company a letter demanding that Leuko Labs acknowledge Mr. Gamble's promised equity in the Company.

63. Leuko Labs never responded to the September 2021 demand letter.

64. To date, and despite demand, Leuko Labs has failed to pay Mr. Gamble the equity owed.

## COUNT I – BREACH OF EXPRESS CONTRACT

65. Mr. Gamble realleges each and every preceding paragraph as if fully set forth herein.

66. The Founders Agreement is a valid and enforceable contract to which Mr. Gamble is a party.

67. Pursuant to the Founders Agreement, Leuko Labs agreed to divide ownership in the Company with Mr. Gamble receiving 6% of initial equity shares.

68. Mr. Gamble worked for over twelve months of full time work and thus vested 25% of his Founder's shares in Leuko Labs.

69. Mr. Gamble performed all obligations required of him under the Founders Agreement.

70. Accordingly, pursuant to the Founders Agreement, Mr. Gamble is entitled to a number of shares in Leuko Labs equal to 1.5% of the outstanding equity of the Company at the time of formation, subject to all stock splits, adjustments, reclassifications that all other founders have been subjected to over the Company's history.

71. Leuko Labs' continued failure to pay Mr. Gamble his shares is a material breach of contract.

72. Leuko Labs' continued failure to pay Mr. Gamble his shares is a breach of the covenant of good faith and fair dealing.

### COUNT II – BREACH OF IMPLIED-IN-FACT CONTRACT

73. Mr. Gamble realleges each and every preceding paragraph as if fully set forth herein.

74. In the alternative to Count I, should the Court reject all or any part of Mr. Gamble's allegations of his claim for breach of express contract or find any provisions of the Founders Agreement to be barred or unenforceable, Mr. Gamble alleges that a contract implied-in-fact existed between Mr. Gamble and Leuko Labs, under which Mr. Gamble was granted a 6% ownership share in Leuko Labs.

75. Mr. Gamble worked full time for Leuko Labs for over twelve months without receiving salary or other cash compensation. Rather, Mr. Gamble and the other Founders of the Company all expected Leuko Labs to provide compensation to Mr. Gamble in the form of equity in the Company.

76. Mr. Gamble provided a benefit to Leuko Labs through his full time work, business expertise, and fundraising efforts.

77. Mr. Gamble performed all obligations required of him under the contract implied-in-fact.

78. Pursuant to the contract implied-in-fact, Mr. Gamble is entitled to a number of shares in Leuko Labs equal to 1.5% of the outstanding equity of the Company at the time of formation, subject to all stock splits, adjustments, reclassifications that all other founders have been subjected to over the Company's history.

79. Leuko Labs' continued failure to pay Mr. Gamble his shares is a material breach of contract.

80. Leuko Labs' continued failure to pay Mr. Gamble his shares is a breach of the covenant of good faith and fair dealing.

### COUNT III – UNJUST ENRICHMENT

81. Mr. Gamble realleges each and every preceding paragraph as if fully set forth herein.

82. Leuko Labs has been unjustly enriched as a result of non-payment for Mr. Gamble's services for the Company as described in this Complaint.

83. Leuko Labs has, through its unjust actions, been enriched and Mr. Gamble has suffered damages in amounts to be proven at trial, but which exceed $250,000.

84. The continuing retention by Leuko Labs of the benefits provided by Mr. Gamble to Leuko Labs violates fundamental principles of justice, equity, and good conscience to the detriment of Mr. Gamble.

### COUNT IV – QUANTUM MERUIT

85. Mr. Gamble realleges each and every preceding paragraph as if fully set forth herein.

86. In the alternative to Counts I and II, should the Court reject all or any part of Mr. Gamble's allegations of its claims for breach of contract or find any provisions of the Founders Agreement to be barred or unenforceable, Mr. Gamble alleges that he performed valuable services to benefit Leuko Labs for which he expected compensation from the Company.

87. Mr. Gamble did not perform the services gratuitously.

88. Leuko Labs accepted Mr. Gamble's services with the knowledge that Mr. Gamble expected compensation.

89. Mr. Gamble's services to Leuko Labs were, and continue to be, of measurable benefit to Leuko Labs.

90. The circumstances are such that it would be unjust to allow Leuko Labs to retain the benefits of Mr. Gamble's services.

## COUNT V – PROMISSORY ESTOPPEL

91. Mr. Gamble realleges each and every preceding paragraph as if fully set forth herein.

92. In the alternative to Counts I and II, should the Court reject all or any part of Mr. Gamble's allegations of its claims for breach of contract or find any provisions of the Founders Agreement to be barred or unenforceable, Mr. Gamble alleges that Leuko Labs made an unambiguous promise to Mr. Gamble that he would be entitled to ownership in Leuko Labs in exchange for his services for the Company.

93. Mr. Gamble relied on such a promise, as evidenced by the fact that Mr. Gamble worked for Leuko Labs without a salary or other cash payment for over a year.

94. Mr. Gamble's reliance was expected and foreseeable by Leuko Labs.

95. Mr. Gamble relied on such promise to his detriment.

96. Injustice to Mr. Gamble can only be avoided by enforcement of Leuko Labs' promise of equity to Mr. Gamble.

## COUNT VI – DECLARATORY JUDGMENT

97. Mr. Gamble realleges each and every preceding paragraph as if fully set forth herein.

98. An actual, present, and justiciable controversy has arisen between Leuko Labs and Mr. Gamble concerning Mr. Gamble's entitlement to ownership shares of the Company.

99. Mr. Gamble seeks declaratory judgment from this Court that he is entitled to ownership of Leuko Labs under the Founders Agreement and nullifying any agreements that dilute his ownership interest in the Company.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Gamble prays for entry of judgment against Leuko Labs as follows:

A. An entry of judgment in favor of Mr. Gamble against Leuko Labs;

B. An award of actual damages, compensatory damages, punitive and exemplary damages, attorneys' fees and costs; and

C. Such other and further relief as this Court or a jury may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mr. Gamble demands a trial by jury on all issues triable by jury.

| | |
|---|---|
| Dated: February 10, 2022 | By    <u>*/s/ Olivia T. Nguyen*</u> |

                                        Olivia T. Nguyen, (BBO 682774)
                                        **Perkins Coie LLP**
                                        633 West 5th Street, Suite 5850
                                        Los Angeles, CA 90071
                                        Telephone: 310.788.3254
                                        Facsimile: 310.843.1263
                                        ONguyen@perkinscoie.com

                                        Jose A. Lopez (*pro hac vice* application forthcoming)
                                        Benjamin N. Prager (*pro hac vice* application forthcoming)
                                        **Perkins Coie LLP**
                                        110 N. Wacker Dr., Suite 3400
                                        Chicago, IL 60606
                                        Telephone: 312.324.8400
                                        Facsimile: 312.324.9400
                                        jlopez@perkinscoie.com
                                        bprager@perkinscoie.com

                                        *Attorneys for Ramon Gamble*